**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BAKHODIR MADJITOV, ) | |
| ) | |
| Plaintiff ) | |
| v. ) | |
| ) | **Civ. No. 1:20-CV-04394-FB-RER** |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| FNU AGUILERA, ) | |
| ) | |
| AMMAR SYED, and ) | |
| ) | |
| FNU GORIAH, ) | |
| ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY
INJUNCTION**

## Table of Contents

Table of Authorities ............................................................................................................ 2

**Introduction** .................................................................................................................... 4

**Background** .................................................................................................................... 7
  I.      Plaintiff Bakhodir Madjitov .................................................................................. 7
  II.     Defendants ............................................................................................................ 9
  III.    ICE Unlawfully Attempted to Forcibly Remove Plaintiff .................................. 10
  IV.     Plaintiff Required Emergency Hospital Care Due to Abuse by ICE ................. 13
  V.      ICE Officers Interfered with the Accurate Documentation of Plaintiff's Medical Records
          14
  VI.     Plaintiff Continues to Suffer Long-Term Effects of ICE Abuse ....................... 15
  VII.    Plaintiff Will Be Persecuted and Tortured Upon Removal to Uzbekistan ................ 16

**Argument** ...................................................................................................................... 24
  I.      This Court Is Authorized to Grant The Requested Temporary Restraining Order and
          Preliminary Injunction ........................................................................................ 24
          a.    The Constitutional Access-to-Courts Doctrine Empowers the Court to Issue the
                Temporary Stay of Removal. ........................................................................ 24
          b.    Article III Empowers This Court to Issue the Temporary Stay ................... 27
          c.    The All Writs Act Provides a Separate Source of Authority for This Court to Issue the
                Temporary Stay ........................................................................................... 27
          d.    The Immigration and Nationality Act Does Not Strip This Court of Its Power to Issue a
                Temporary Stay ........................................................................................... 28
  II.     Plaintiff Is Entitled to Preliminary Injunctive Relief ....................................... 30
          a.    Plaintiff Is Likely to Succeed On The Merits ............................................. 30
                i.     Plaintiff is Likely to Prevail in His Assault Claim ............................. 31
                ii.    Plaintiff is Likely to Prevail in His Battery Claim ............................. 32
                iii.   Plaintiff is Likely to Prevail in His Negligence Claim ....................... 34
          b.    Plaintiff Will Suffer Irreparable Harm Absent Relief................................. 35
                i.     Plaintiff Will Be Unable to Pursue His FTCA Claim If Denied a TRO and
                       Preliminary Injunctive Relief. .......................................................... 36
          c.    The Balance of Hardships and The Public Interest Support A Preliminary Injunction 38

**Conclusion** ................................................................................................................... 40

**Certificate of Service** ................................................................................................. 42

## TABLE OF AUTHORITIES

**Cases**

*Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc) ............................... 37
*Bastein v. Sotto*, 749 N.Y.S.2d 538, 539 (2002)..................................................... 31, 32
*BE & K Constr. Co. v. NLRB*, 536 U.S. 516 (2002) ...................................................... 24
*Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ... 6, 8, 9,
      15
*Bounds v. Smith, 430 U.S. 817, 824 (1977)* ................................................................. 24

*Caban v. United States*, 728 F.2d 68, 70 (2d Cir. 1984)..................................................... 31
*Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 ................................................................... 27
*Christopher v. Harbury*, 536 U.S. 403, 413-14 (2002)..................................................... 26
*Clinton v. Jones*, 520 U.S. 681, 706 (1997) .................................................................. 27
*Crews v. Cty. of Nassau,*612 F.Supp.2d 199, 205 (E.D.N.Y. 2009) ................................. 33
*Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019) ........................................ 31
*Johnson v. Avery*, 393 U.S. 483, 498 n.24 (1969) .......................................................... 25
*Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ........................................................... 27
*Lewis v. Casey*, 518 U.S. 343 (1996) ........................................................................... 24
*Madjitov v. U.S. Attorney General*, No. 19-13865, Order dated Nov. 25, 2019 at 3-4
   (Rosenbaum, dissenting)............................................................................... 35, 38
*Madjitov v. U.S. Attorney General*, No. 19-13865, Order dated Sep. 14, 2020 ................. 35
*Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010)................. 29
*Missouri v. Jenkins*, 515 U.S. 70, 88 (1995) .................................................................. 26
*Nken v. Holder*, 129 S. Ct. 1749 (2009).................................................................... 6, 28
*Nken v. Holder*, 556 U.S. 418, 435 (2009) .............................................................. 26, 37
*Penn. Bureau of Corr. v.U.S. Marshals Serv.*, 474 U.S. 34, 41 (1985)............................... 27
*Procunier v. Martinez*, 416 U.S. 396, 419 (1974) .......................................................... 25
*Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481-82 (1999) ...................... 28
*Richards v. United States*, 369 U.S. 1, 6 (1962) ............................................................ 30
*Thornburgh v. Abbott*, 490 U.S. 401 (1989) ................................................................. 25
*United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967)........... 25
*United States v. Denedo*, 129 S. Ct. 2213, 2222 (2009) ................................................. 28
*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)................................................. 30
*Wolff v. McDonnell*, 418 U.S. 539, 579 (1974) ............................................................. 24
*Zgraggen v. Wilsey*, 200 A.D.2d 818, 819 (N.Y. App. Div. 1994) .................................... 32

**Statutes**
8 U.S.C. § 1252(g) ..................................................................................... 26, 27
28 U.S.C. § 1331 .............................................................................................. 26
28 U.S.C. § 1346(b) .......................................................................................... 26
28 U.S.C. § 2680(h) .......................................................................................... 29
8 U.S.C. § 1252(f) ............................................................................................ 27
8 U.S.C. §§ 1101 .............................................................................................. 26
Federal Tort Claims Act, 28 U.S.C. § 1346 ....................................................... 5, 14, 29

**Other Authorities**
2018 DHS Policy Statement 044-05, "Department Policy on the Use of Force........................... 31
Amnesty International, *Fast track to torture: Abductions and Forcible Returns from Russia to
   Uzbekistan* (2016) ...................................................................................... 16
Declaration of Noah Tucker ..................................................................................... 16
Human Rights Watch, *Uzbekistan Country Chapter* (2018) ............................................. 17
ICE 2011 Performance-Based National Detention Standards (Revised 2016)............................ 31
ICE 2019 National Detention Standards for Non-Dedicated Facilities ................................... 31
*Secrets and Lies: Forced Confessions Under Torture in Uzbekistan* (2016) ............. 16, 17, 18, 19
State Department, *Uzbekistan 2016 Human Rights Report* (2017) ............................... 24
U.S. State Department, *Uzbekistan 2017 Human Rights Report* (2018) ..................... 15, 17

United Nations Human Rights Council, *Report of the Special Rapporteur on freedom of religion or belief on his mission to Uzbekistan* (2018) .......................................................... 17
United States Department of State, *Uzbekistan 2016 Human Rights Report* (2017) ................... 18
USCIRF, *Annual Report: Uzbekistan* (2018) ............................................................. 19
USCIS Update to the Detention and Deportation Officers Field Manual: Appendix 16-4, Part 2, Enforcement Standard Pertaining to the Escorting of Aliens .................................................... 31
*We Will Find You* ............................................................................................. 18

## INTRODUCTION

Plaintiff, Mr. Bakhodir Madjitov, has filed a civil rights action for damages seeking redress for serious injuries caused by the tortious and unconstitutional conduct of United States Government officials. So that he can effectively access the court and properly seek damages for the harms he suffered, Plaintiff seeks an expeditious Temporary Restraining Order and subsequent Preliminary Injunction to enjoin Defendant United States of America and its employees from removing him from the United States for the duration of these proceedings.

Counsel for Mr. Madjitov have contacted government attorneys to request that the government voluntarily agree to a temporary stay of removal. Counsel spoke with Assistant U.S. Attorney James R. Cho, who stated that he could not take a position on the request prior to reviewing the filings. The undersigned counsel intends to send all of the documents associated with the Motion for a Temporary Restraining Order and a Preliminary Injunction, as well as with the Complaint, to government counsel as soon as they have been filed. At present, the government has not agreed to a temporary stay for Mr. Madjitov. Because Mr. Madjitov has been moved twice in the last two days, and is currently at an ICE "staging center" in Alexandria, Louisiana, out of which removals via charter flights appear to be routinely carried out, this plea for relief cannot wait. Mr. Madjitov has no choice but to seek assistance from this Court to stave off actions by the government that could prove to be tragic and incontrovertible. He respectfully moves this Court, therefore, to issue an emergency stay enjoining his removal.

This action arises out of the intentional, violent, and unlawful attempted removal of Mr. Madjitov on the evening of June 10, 2019 into the morning of June 11, 2019—in contravention of a Third Circuit stay of removal that was then in effect, in contravention of the rights guaranteed to Mr. Madjitov by the Constitution of the United States, and in contravention of common law protections against unwarranted violence and abuse.

On September 17, 2020, the United States Immigration and Customs Enforcement Agency ("ICE") transferred Mr. Madjitov from Etowah County Detention Center, where he was held in long-term detention, to LaSalle ICE Processing Center. On September 18, 2020, ICE then transferred Mr. Madjitov from LaSalle ICE Processing Center to Alexandria ICE Staging Center with the expectation of again moving him within one business day, apparently in preparation for his removal from the United States to Uzbekistan, potentially through a chartered flight from Alexandria International Airport.

If Plaintiff is removed from the United States and returned to Uzbekistan, he will almost certainly be detained by the Uzbekistani government and tortured or killed. Under such circumstances, there is little question that he will be unable to participate meaningfully in this case and effectively pursue the damages he is entitled to under the Federal Torts Claims Act and the United States Constitution. Even in the unlikely event that he is not arrested and tortured or killed, upon removal to Uzbekistan, Plaintiff will not have access to a computer, a reliable internet connection, or reliable phone service in order to communicate with counsel, access this Court, and continue pursuing this case.

Absent an order from this Court staying Mr. Madjitov's deportation pending resolution of this case on the merits, ICE will effectively be able to ensure that Defendant United States and its

agents escape accountability for their tortious and unconstitutional conduct, by rendering Mr. Madjitov unable to pursue a case against them.

Each of the factors set forth by the Supreme Court in *Nken v. Holder*, 129 S. Ct. 1749 (2009), favors granting injunctive relief in the present case. First, Mr. Madjitov is likely to succeed on the merits because Defendants have plainly committed egregious tortious acts, including assault and battery, in the context of an unlawful attempt to deport him. Second, he is certain to suffer irreparable harm absent preliminary relief because upon removal to Uzbekistan, Mr. Madjitov is very likely to be detained, tortured, and persecuted, rendering him unable to avail himself of his right to pursue damages under the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA") and *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ("Bivens"). Lastly, the balance of hardships and the public interest strongly favor a stay of his removal order because Mr. Madjitov stands to suffer considerable irreparable injury, especially as it relates to the denial of his effective access to the court, while in contrast, neither the public, nor the Government, will suffer material hardship from a preliminary injunction temporarily allowing Mr. Madjitov to remain in the country during the pendency of this litigation against the Government. Furthermore, it is in the public interest to allow plaintiffs alleging serious harms at the hands of government officials to pursue their claims in federal court. It is decidedly *against* the public interest to allow federal agencies to ignore federal court orders and commit serious torts without consequence or meaningful review by the judiciary.

# BACKGROUND[1]

## I.    Plaintiff Bakhodir Madjitov

Plaintiff **Bakhodir Madjitov** is a 39-year-old Muslim immigrant from Uzbekistan who entered the United States on March 12, 2006 on a P-3 Visa for Artists or Entertainers and remained after his visa expired. He later married Madina Mamadjonova, a United States citizen residing in Broadbrook, Connecticut. Together they have three native-born United States citizen sons between the ages of two and nine.

Mr. Madjitov timely applied for asylum on December 12, 2006. The Board of Immigration Appeals dismissed Mr. Madjitov's application on July 24, 2014 and he has been subject to a final order of removal since then. For years, Mr. Madjitov lived quietly in Connecticut under that final order of removal, until he was arrested in the early morning hours of December 22, 2017, exactly one week before the birth of his third child. ICE charged Mr. Madjitov only with noncompliance with his three-year-old removal order. He has been in ICE custody since that time.

Since his detention by ICE, Mr. Madjitov has pursued multiple avenues of immigration relief, with litigation ongoing in the United States Court of Appeals for the Second Circuit. That appeal concerns the denial of a habeas corpus action asserting that Mr. Madjitov be allowed to avail himself of the provisional waiver process held out by the Department of Homeland Security ("DHS") specifically to immigrants in Mr. Madjitov's position: that is, to immigrants with final orders of removal who have an approved I-130 Petition for Alien Relative, and whose departure from the country would incur lengthy bars on reentry and perpetuate family separation.

---

[1] Given the urgency of filing this memorandum prior to Mr. Madjitov's imminent removal, this memorandum was unable to exhaustively incorporate direct references to sections of Mr. Madjitov's affidavit in the facts section. All of the facts cited in this memorandum, not otherwise attributed to alternative exhibits, are drawn from Mr. Madjitov's declaration, Exhibit A.

Until the morning of September 17, 2020, Mr. Madjitov was placed in long-term detention at the Etowah County Detention Center in Gadsden, Alabama. On the night of September 16, 2020, ICE locked Mr. Madjitov's commissary account. Mr. Madjitov informed the undersigned counsel, based on his prior experience, that he understood ICE intended to imminently remove him from the United States, as the closing of this account constitutes an initial step in the preparations to remove him. Previously, in both June of 2019 and November of 2019, Mr. Madjitov's commissary account was locked at the Etowah County Detention Center shortly before he was transferred to LaSalle ICE Processing Center in preparation for his attempted removal to Uzbekistan. The first of those occasions resulted in the unlawful and violent attempt to remove Mr. Madjitov that is the basis for the present action under the FTCA and *Bivens*.

On the morning of September 17, 2020, ICE transported Mr. Madjitov from the Etowah County Detention Center in Gadsden, Alabama, to the LaSalle ICE Processing Center in Jena, Louisiana. *See* ICE Detainee Locator (Sep. 17, 2020). Upon information and belief, today, September 18, 2020, ICE then transported Mr. Madjitov from the LaSalle ICE Processing Center to Alexandria ICE Staging Facility in Alexandria, Louisiana. Upon information and belief, this afternoon, September 18, 2020, Mr. Madjitov called his wife from the ICE Alexandria Staging Facility in Alexandria, Louisiana, and told her that he was expected to be moved within one business day.  He understands that ICE intends to remove him to Uzbekistan imminently, and possibly as soon as today on a flight out of Alexandria International Airport, where ICE Air frequently charters deportation flights. *See* Bryn Stole, *Thirteen ICE Staffers at Alexandria International Airport Test Positive for Coronavirus*,

https://www.nola.com/news/coronavirus/article_e9d5ea0c-7f6a-11ea-b094-5722f480ca98.html

(Apr. 15, 2020) ("The ICE Alexandria Staging Facility is normally used as a holding pen for immigration detainees as they await deportation flights out of the Alexandria International Airport. ICE Air, the agency's charter deportation airline, uses the airport as a hub for dedicated deportation flights").

## II.   Defendants

Defendant **United States of America** is sued under the Federal Tort Claims Act for the tortious actions of its employees, including ICE employees.

Defendants **FNU Aguilera**,[2] **Ammar Syed**, and **FNU Goriah** are officers or agents employed by ICE, and are the ICE agents responsible for: (1) the unlawful attempted removal of Plaintiff Madjitov, described below, (2) the unnecessary and unlawful force used against Plaintiff Madjitov during his attempted removal, described below, and (3) the interference into Plaintiff Madjitov's medical treatment and the proper documentation of that medical treatment, described below. All ICE agent defendants are being sued under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) in their individual capacities.

Defendant Supervisor **FNU Aguilera** was at all relevant times an ICE employee working at John F. Kennedy International Airport ("JFK") in Queens, New York on the evening of June 10, 2019 into the morning of June 11, 2019, during the unlawful attempted removal of Plaintiff Madjitov. Defendant Aguilera was responsible for supervising Plaintiff Madjitov's removal. Defendant Aguilera is being sued in his individual capacity.

Defendant Officer **Ammar Syed** was at all relevant times an ICE employee assigned to the matter of unlawfully attempting to remove Plaintiff Madjitov on the evening of June 10, 2019

---

[2] Plaintiff Madjitov has noted that he identified ICE Supervisor "Aguilera" based on having read that name or a similar name on the supervisor's badge, but that the name may have in fact been Aguilar. Because he expressed believing that the name was actually Aguilera, the ICE supervisor involved in this incident is referred to throughout this Motion by this name—subject to amendment, upon carrying out discovery in the course of this litigation.

into the morning of June 11, 2019. Defendant Syed was responsible for carrying out the unlawful

forcible attempt to remove Plaintiff Madjitov at JFK in Queens, New York, and later overseeing

Plaintiff Madjitov's emergency medical treatment at Jamaica Hospital Medical Center in

Queens, New York. Defendant Syed is being sued in his individual capacity.

Defendant Officer **FNU Goriah** was at all relevant times an ICE employee assigned to

the matter of unlawfully attempting to remove Plaintiff Madjitov on the evening of June 10, 2019

into the morning of June 11, 2019. Defendant Goriah was responsible for carrying out the

unlawful attempt to remove Plaintiff Madjitov at JFK in Queens, New York, and later overseeing

Plaintiff Madjitov's emergency medical treatment at Jamaica Hospital Medical Center in

Queens, New York. Defendant Goriah is being sued in his individual capacity.

### III.    ICE Unlawfully Attempted to Forcibly Remove Plaintiff

In early June 2019, Mr. Madjitov was suddenly moved from his long-term detention

center in Gadsden, Alabama, to the ICE processing center in Jena, Louisiana, and then to the

Hudson County Correctional Center in New Jersey on or around June 7, 2019. Mr. Madjitov

came to understand that ICE was planning to remove him, despite the fact he had a case still

pending before the BIA at the time.

In view of his imminent removal, Mr. Madjitov filed a Petition for Review *pro se* in the

United States Court of Appeals for the Third Circuit on June 7, 2019, seeking review of the

BIA's refusal to grant him a stay while his case was pending before that tribunal. The Third

Circuit responded by issuing a temporary stay of removal on June 10, 2019—a stay which

remained effective until July 30, 2019. Mr. Madjitov learned of the stay from his wife, who

called with the news around noon on June 10, 2020. The stay was then formally entered in the

docket at 5:08 p.m. that afternoon, hours before ICE's unlawful attempt to remove him.

At around 10:00 p.m. on the night of June 10, 2019, ICE attempted to remove Mr.

Madjitov in blatant defiance of the Third Circuit's order staying his removal. Security guards

from the Hudson County Correctional Center first bound Mr. Madjitov in shackles at his hands,

feet, and waist before transporting him in a white van from the Correctional Center, where he

had been held by ICE, to JFK International Airport. Mr. Madjitov was released from his shackles

when he exited the van, but the two ICE officers, Defendants Goriah and Syed, who met him at

the airport proceeded to handcuff Mr. Madjitov before bringing him inside the airport.

Once at the airport, Mr. Madjitov informed Defendants Goriah and Syed that they had no

right to force him to board a plane in violation of the stay of removal ordered by the Third

Circuit. One of the ICE officers laughed at Mr. Madjitov and stated that Mr. Madjitov did not

have a stay of removal in place. Mr. Madjitov insisted that Officers Goriah and Syed were

mistaken, and again told them that he did indeed have a stay of removal in effect. Throughout

that evening, Mr. Madjitov repeatedly stated that he had a stay of removal issued by the Third

Circuit. In response, Defendants Goriah and Syed, and subsequently Defendant Aguilera, an ICE

supervisor, simply mocked him and wrongfully retorted that he did not.

Shortly after midnight, Defendants Goriah and Syed took Mr. Madjitov to another

terminal, through the security checkpoint, and towards a terminal gate for a flight scheduled to

depart for Uzbekistan. On their walk through the airport and then to the departure area, the

officers restrained each of Mr. Madjitov's arms by tightly holding onto them.

As they approached the boarding area, Mr. Madjitov refused to board, telling the officers,

"I'm not going to go because I have a stay of removal." Defendants Goriah and Syed responded

to Mr. Madjitov's assertion of his rights by mocking him, grabbing his hands, and forcibly

pushing him toward the plane. Mr. Madjitov responded resolutely and nonviolently by standing in place with his arms at his sides.

At this point, Defendant Aguilera approached Mr. Madjitov, and in a whisper threatened him, ordering him to comply with the unlawful deportation. He told Mr. Madjitov, "If you don't get on this airplane by your own will, I'm going to put you in handcuffs and take you inside the airplane." Mr. Madjitov again said he would not get on the plane. Defendant Goriah then similarly whispered a threat to Mr. Madjitov: "If you don't get on the plane, I'm going to tase you, shock you – we're going to bring you on the plane." Then, all three ICE agents again began physically pushing and pulling Mr. Madjitov towards the plane, applying pressure to both the right and left sides of his body, as well as his back, in furtherance of their unlawful attempted to remove him in defiance of a court-ordered stay of removal.

The agents soon began applying increasingly violent force, beating Mr. Madjitov with their bare hands and pushing him against a wall. When the agents pushed Mr. Madjitov against the wall, his head hit the wall first with such force that it recoiled backwards, straining and twisting his neck.

Then, Defendant Goriah reached for his electric taser and proceeded to tase Mr. Madjitov on his back behind his right rib cage for approximately fifteen seconds. Mr. Madjitov screamed for help, and Defendant Goriah tased Mr. Madjitov a second time, again in the same location, for approximately fifteen seconds. The tasing was severely painful, producing immediate, hot and intense sores. Mr. Madjitov felt as if he was going to "lose [his] mind." Mr. Madjitov once again yelled for help, and the ICE officers responded by pushing him to the ground and handcuffing him.

By this time, a large group of people had gathered in the area of the airport where the ICE officers were assaulting Mr. Madjitov.

Using obscene and abusive language, Defendant Goriah then demanded Mr. Madjitov, who had just been beaten, tased twice, and handcuffed, to stand up on his own, yelling at him, "Get up, you fuck, let's get up." Mr. Madjitov was unable to muster the strength to stand up because of the intense pain he was experiencing from being tased. When Mr. Madjitov expressed difficulty in standing, Defendants Goriah and Syed dragged him up off the ground and forced him to walk outside despite the great and paralyzing pain that Mr. Madjitov was experiencing. None of the officers offered Mr. Madjitov medical attention. Instead, Defendant Goriah again accosted Mr. Madjitov: "Let's walk, you fuck, let's walk, you're not gonna fly today, you fuck."

### IV.   Plaintiff Required Emergency Hospital Care Due to Abuse by ICE

Upon exiting the airport terminal, the three ICE agents put Mr. Madjitov in the back of a cargo van and closed the doors. At this point, a group of local police officers saw what was happening and approached the Defendants and Mr. Madjitov. The police officers and the ICE agents conversed outside of Mr. Madjitov's earshot. Suddenly, Defendants Goriah and Aguilera opened the cargo van's doors. Now in the presence of local police officers, the ICE agents dramatically changed their tone and demeanor towards Mr. Madjitov. Only then did the ICE agents ask about Mr. Madjitov's well-being and offer to call an ambulance. Mr. Madjitov was in terrible pain, and accepted the offer to go to the hospital.

In the ambulance, still monitored by Defendant Syed, Mr. Madjitov told the paramedic about the assault, described his pain, and noted the areas on his body where the tasing wounded him. The ambulance paramedic remarked that those tased areas were red, hot, and burned. The ambulance then transported Mr. Madjitov to the nearby Jamaica Hospital Medical Center.

**V.    ICE Officers Interfered with the Accurate Documentation of Plaintiff's Medical Records**

At the hospital, Mr. Madjitov told a nurse that ICE agents had assaulted him with physical force and an electric taser at JFK airport, and that now he was experiencing very strong pain in different parts of his body. Defendants Goriah and Syed, also present in the examination room, handcuffed Mr. Madjitov to his bed and frequently interrupted Mr. Madjitov's conversation with the nurse to justify their assault on him—untruthfully saying that Mr. Madjitov had to be subdued after resisting ICE's efforts to handcuff him.

After being transferred to another room at the hospital and again handcuffed to the bed, Mr. Madjitov again explained his assault at the airport and the pain he was feeling to a doctor and group of nurses. The doctor then gave Mr. Madjitov 800 mg of ibuprofen to help alleviate the pain caused by the assault.

At the end of Mr. Madjitov's hospital visit, a nurse handed Mr. Madjitov his discharge papers, but Defendant Goriah forcibly abruptly snatched the papers away before Mr. Madjitov could read them. Defendant Goriah then privately conversed with Defendant Syed. Defendant Syed then privately conversed with and returned the discharge papers to the nurse. The nurse took the returned papers and talked to the doctor who had treated Mr. Madjitov. The doctor then typed on her computer—located about ten feet from Mr. Madjitov's bed—before printing a new set of discharge papers.

When the nurse returned with the new discharge papers, the nurse handed them first to the ICE officers for their review and approval before eventually giving the papers to Mr. Madjitov. Mr. Madjitov's hospital records note: "Discharge documents given to [ICE officers]." Jamaica Medical Center Records, Exhibit D, at 21.

Mr. Madjitov's hospital records diagnose him with acute bilateral thoracic back pain. This diagnosis reflects physical injuries inflicted upon Mr. Madjitov by Defendants when they tased him twice. *See id*., at 21. ("Pt c/o back pain secondary to being tazed by pd"). Nonetheless, Mr. Madjitov's hospital records are not fully consistent with the information he provided to the medical providers at the hospital. First, the records indicate that Mr. Madjitov denied having a head or neck injury, even though he told the providers he did suffer such injuries. *See id*., at 21. His head and neck injuries are also reflected in his daily provision of ibuprofen at the New Jersey correctional facility he was taken to after the hospital and in the long-term aches he experiences to this day in the neck area. Second, the records note Mr. Madjitov's pain was "mild," did not "radiate," and did not include headaches, weakness, or numbness. These records do not reflect how Mr. Madjitov described his injuries to the nurse and doctor, and are at odds with the subsequent documentation of his pain following the assault. *See id*., at 24. Lastly, the records state that Mr. Madjitov had no signs of overt trauma or injury, statements which conflict with the ambulance paramedic's comment that the area on Mr. Madjitov's back where he was tased was both red and burned. *See id*., at 22.

## VI.    Plaintiff Continues to Suffer Long-Term Effects of ICE Abuse

Since ICE agents abused him at JFK, Mr. Madjitov has experienced recurring back pain; bouts of spinal pain which radiate from his back to his right shoulder and chest and then to his neck and head; and numbness on the left side of his body. Mr. Madjitov did not experience these forms of pain and injury prior to ICE's assault.

Additionally, Mr. Madjitov struggles with anxiety and depression. The latter condition has been diagnosed by doctors at the Etowah County Detention Center in Alabama, where Mr. Madjitov was detained until the morning of September 17, 2020. *See* Etowah County Detention Center Medical Records, Exhibit E, at 3. Such conditions are not merely the byproduct of Mr.

Madjitov's prolonged and unnecessary detention by ICE. Mr. Madjitov's wife has declared that after he was abused at JFK, specifically, Mr. Madjitov became hopeless and silent—a dramatic change from before the assault. *See* Declaration of Madina Mamadjonova, Exhibit B.

Taken together, the assault at JFK and other tortious acts committed by ICE agents against Mr. Madjitov on that occasion constitute the basis for Mr. Madjitov's complaint alleging claims under the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA") and *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ("Bivens").

### VII. Plaintiff Will Be Persecuted and Tortured Upon Removal to Uzbekistan

Upon deportation to Uzbekistan, Mr. Madjitov is likely to be tortured and persecuted on the basis of his familial tie to a brother-in-law, now deceased, who was affiliated with Al-Nusra, the official Syrian branch of al-Qaeda.

On December 22, 2017, the Department of Justice publicly announced that it had arrested another of Mr. Madjitov's brother-in-laws, Sidikjon Mamadjonov, for various immigration offenses. *See* DOJ Press Release (Dec. 22, 2017), Exhibit F. Specifically, the government alleged that Sidikjon lied about his knowledge of, and contact with, his brother, Saidjon, who fought in Syria with the al-Nursa terrorist group. *Id.* Saidjon died in 2013. However, according to the government, Sidikjon lied about his knowledge of Saidjon's death, and declined to tell the government that he had been sent a FedEx package containing his dead brother's phone, which contained al-Nusra videos and recruitment messages. *Id.* Soon after the FBI arrested Sidikjon, Mr. Madjitov was taken into ICE custody. *Id.* Ample evidence supports the conclusion that, as a result of the DOJ's public reporting of Saidjon and Sidikjon, Mr. Madjitov is even more likely to be detained, persecuted, and tortured if removed to Uzbekistan on the basis of his brother-in-law's affiliation with an Islamist terrorist organization. *See* Declaration of Noah Tucker, Exhibit C.

Mr. Madjitov's worst fears of detention and torture based on unfounded allegations of extremism are supported by country condition reports from the U.S. Department of State, Human Rights Watch, Amnesty International, and the United States Commission on International Religious Freedom. The U.S. Department of State acknowledges that the government of Uzbekistan has "significant human rights issues" including "torture and abuse of detainees." U.S. State Department, *Uzbekistan 2017 Human Rights Report* (2018), Exhibit J, at 1. Muslims believed to have unorthodox or extreme views outside of authorized religious groups are at particular risk of being arrested, detained and tortured with impunity. *Id.* at 3. Human rights groups such as Amnesty International describe the deportation of asylum seekers to Uzbekistan as a "fast-track to torture" and urge that the "international community should be . . . cautious indeed in its own security co-operation" with Uzbekistan. Amnesty International, *Fast track to torture: Abductions and Forcible Returns from Russia to Uzbekistan* (2016), Exhibit L, at 24. Government authorities frequently use torture as a means to extract confessions from detainees arrested on fabricated charges. *See* Amnesty International, *Secrets and Lies: Forced Confessions Under Torture in Uzbekistan* (2016), Exhibit M ("*Secrets and Lies*"); Declaration of Noah Tucker, Exhibit C.

Here, the record demonstrates—and at the very least, supports a *prima facie* showing— that Uzbekistan would impute the alleged "terrorist opinion[s]" of Saidjon and the alleged associated wrongful acts of Sidikjon to Mr. Madjitov, a man who has never committed a crime or otherwise been implicated in terroristic activity or sentiments. For example, "[t]he Uzbekistani authorities routinely target relatives of detainees . . . charged with . . . 'anti-state' offenses" and "frequently beat [such] relatives." *Secrets and Lies*, Exhibit M, at 50-51. Further, and in service of this crackdown, "[i]n August 2014[,] a new law on the prevention of crimes entered in legal

17

force. . . . Those named on the registers included . . . suspected members of banned Islamist groups and their families." *Id.*, at 53. As a result, the record suggests that family members of suspected terrorists are targeted for torture not just to reveal information about their relatives— although there is plenty of that in the record, too. What these sources also suggest is that family members are actually charged under the criminal law or monitored as potential criminals— directly imputing to them the political opinions of others. *See id.,* at 51 ("In many cases, members of the same family . . . have been . . . sentenced to long terms of imprisonment after unfair trials.").

Human Rights Watch reports that generally the result is that "thousands of religious believers, religious Muslims who practice their religion outside strict state controls, remain imprisoned on vague charges of extremism." Human Rights Watch, *Uzbekistan Country Chapter* (2018), Exhibit N; *see also* United Nations Human Rights Council, *Report of the Special Rapporteur on freedom of religion or belief on his mission to Uzbekistan* (2018), Exhibit O, at 13. The 2018 report from the UN Special Rapporteur echoes the observation that charges of religious extremism are used as a pretext for arbitrary arrests and convictions. The Special Rapporteur notes that most citizens identify as Muslim but do not engage in the corresponding religious practice because religious believers and practitioners "risk being accused of stirring religious intolerance or, worse, identified with spreading extremism." United Nations Human Rights Council, *Report of the Special Rapporteur on freedom of religion or belief on his mission to Uzbekistan* (2018), Exhibit O, at 17.

Conditions in Uzbekistani prisons and detention centers are grim. The State Department reports that "overcrowding, severe abuse, and shortages of medicine" are common. U.S. State Department, *Uzbekistan 2017 Human Rights Report* (2018), Exhibit J, at 4. Prisoners are

"subjected to temperatures below freezing in winter and over 120 degrees Fahrenheit in summer." *Id.* Worse yet, prisoners report widespread torture, including the use of stress positions, electric shocks, the insertion of needles under one's nails, and suffocation, among other techniques. *Id.; see also* Amnesty International, *Fast Track to Torture,* Exhibit L, at 18-20.

The use of torture is directed particularly against people like Mr. Madjitov—family members of suspected Islamic terrorists. As the 2016 Amnesty Torture Report makes painfully clear, "[s]ecurity forces are targeting whole families . . . [who are] arbitrarily detained, tortured, and otherwise ill-treated." *Secrets and Lies*, Exhibit M, at 7. The other reports are to similar effect. *See* Amnesty International, *We Will Find You Anywhere: The Global Shadow of Uzbekistani Surveillance* (2017), Exhibit P, at 8 ("*We Will Find You*") ("It is a common and widespread practice in Uzbekistan for local authorities [and] police . . . to harass and threaten families as a means of exerting pressure on them . . . ."); United States Department of State, *Uzbekistan 2016 Human Rights Report* (2017), Exhibit K, at 8 ("Local human rights activists reported that police and security service officers, acting under pressure to break up extremist cells, frequently detained and mistreated family members and close associates of suspected members of religious extremists groups. Coerced confessions and testimony in such cases were commonplace."). Indeed, Uzbekistan has a long track record of being dangerous and deadly for anyone remotely suspected of holding extremist political beliefs regarding Islam or terrorism. *See* Declaration of Noah Tucker, Exhibit C. Such practices are sanctioned at the highest levels, with former President Karimov explicitly endorsed th[e] practice [of "physical and psychological abuse amounting to torture"], as it relates to relatives of so-called 'Islamist fundamentalists.'" *We Will Find You*, Exhibit P, at 8.

Expert Noah Tucker explains these conditions in the context of Mr. Madjitov's specific

case:

> Multiple cases have demonstrated that relatives whether familial or affinal (by marriage)
> of those convicted on extremism charges or specifically of those known to have traveled
> to participate in the conflict in Syria, are charged as accomplices under legislation against
> extremism or "attempting to overthrow the constitutional order of Uzbekistan" without
> demonstrating any tie between those individuals other than their status as familial or
> affinal relatives: all remaining "evidence" is routinely acquired through torture, but recent
> (March 2020) interviews with non-governmental organizations operating inside
> Uzbekistan and providing legal aid in these cases indicate that no evidence other than the
> fact of association with an individual who has traveled to Syria is necessary to secure a
> conviction. In the unlikely event that relatives are spared torture during the interrogation
> process, prison conditions and mistreatment at the hands of other prisoners and prison
> authorities in maximum security institutions frequently result in death or life-changing
> injuries.

Declaration of Noah Tucker, Exhibit C.

Furthermore, the record is clear that Uzbekistan's security forces use tactics that easily

satisfy the definition of torture. The "techniques" documented in the 2015 Amnesty Torture

Report—a 70-page document devoted to recording new examples of torture amassed in

interviews over a relatively brief period between late 2013 and February 2015 (*Secrets and Lies*,

Exhibit M, at 9)—are horrifying. They include being strapped down to electric chairs and doused

with water (*id.*, at 57), beatings where the victim is "suspended from ceiling hooks by their

hands" (*id.*, at 9), the use of gas masks to induce suffocation (*id.*, at 9), and "rape and sexual

assault with objects, such as bottles or batons" (*id.*, at 9).

In one interview featured in the report, a woman named Zuhra—who was taken in for

questioning because of "two . . . male relatives who were accused of being members of an

extremist Islamic group"—saw (1) women stripped naked and paraded down the halls in front of

others, (2) prisoners "beaten bloody," (3) "the heels of young men melt away" during

"relentless" beatings, and (4) officers press prisoners' hands and feet against hot stoves. *Id.*, at 7-

8. In June 2014, a relative of a detainee relayed accounts of "systematic hazing and humiliation," including prisoners being forced to "beg" supervisors to "accompany them to the toilet," and being forced to wait "for many hours" before being allowed to use the bathroom. And even then, "prisoners must use the toilet with their 'supervisor' watching and humiliating them." *Id.,* at 61.

The DOJ's reporting of Mr. Madjitov's brother-in-law's affiliation with a terrorist organization has placed a target on Mr. Madjitov's back. To make matters worse, the Uzbekistani government will be notified of Mr. Madjitov's deportation because it will have agreed to accept Mr. Madjitov and issue travel documents prior to the carrying out of his removal order. *See* USA.gov, The Deportation Process, Exhibit R. Even without the DOJ reporting of his brothers-in-law, people in Mr. Madjitov's position are likely already being monitored by an Uzbekistani government that is presumptively suspicious of Uzbekistani citizens living abroad and operates an extensive surveillance state that keeps close tabs on expatriates and their families, based on a "belief that Uzbeks overseas are susceptible to subversion and religious extremism." USCIRF, *Annual Report: Uzbekistan* (2018), Exhibit Q, at 5.

Even aside from his family connections, there is ample reason to believe that Mr. Madjitov has long been monitored by the Uzbekistani government. On May 13, 2005, Mr. Madjitov attended an anti-corruption demonstration where thousands gathered in Andijan, Uzbekistan. Soldiers arrived with tanks and lethal weapons and began beating the demonstrators with batons and shooting them without warning. Mr. Madjitov himself was captured, beaten, and subsequently arrested and jailed for five days in Andijan, where he was interrogated, mistreated, and tortured.

Since then, Mr. Madjitov and his family have been surveilled, interrogated, and threatened. *See* Declaration of Madina Mamadjonova, Exhibit B. After Mr. Madjitov fled to the United States, Uzbekistani police have come many times to the house where Mr. Madjitov's mother and three sisters lived, asking them why Mr. Madjitov is in the United States and for his current address, phone number, and a recent photograph. *Id*. The police ask for a photograph so they can see if Mr. Madjitov has grown a beard, a marker of many practicing Muslim men. *Id*. In response, Mr. Madjitov has occasionally sent his family pictures of his face after shaving it solely for the purpose of preventing the persecution of his family by Uzbekistani police. *Id*.

The police also demand to Mr. Madjitov's family that he call them. *Id*. Mr. Madjitov occasionally obliges so that the police will leave his family members alone for a while. *Id*. On a call with the Uzbekistani police in 2016, a decade after Mr. Madjitov immigrated to the United States, the police threatened Mr. Madjitov, demanding he return to Uzbekistan, and intimating that, if he did not, they would forcibly bring him back to Uzbekistan themselves. *Id*.

The notification given to the Uzbekistani government of Mr. Madjitov's deportation from the U.S., coupled with his prior arrest and detention by ICE, places him squarely on the Uzbekistani government's radar and would arouse suspicion, even if for some reason that government has not yet been made aware of the allegations of extremism against his brother-in-law. *See* Declaration of Noah Tucker.

Given this context, it is hardly surprising that the United States Court of Appeals for the Eleventh Circuit has now twice confirmed that Mr. Madjitov—as a family member of a suspected terrorist—will likely be subject to violence and torture by the Uzbekistani government upon return to that country. For example, in a dissent to the court's denial of a motion to stay, Judge Rosenbaum wrote:

With respect to country conditions, Madjitov submitted country reports that showed that the Uzbek government frequently used violence and torture against family members of suspected terrorists and that the Uzbek government's use of such tactics—and its reliance on digital surveillance to keep track of the targets of its tactics—had increased significantly since Madjitov's initial hearing in 2013. Indeed, a 2015 Amnesty International Report indicated, among other conclusions, that (1) police in Uzbekistan were targeting and torturing families to force them to confess to fabricated charges, including being members of extremist Islamic groups; (2) torture is "endemic" in Uzbekistan's criminal-justice system; (3) in response to the resurgence of armed terrorist groups in 2013 and 2014, the Uzbek government routinely labeled people as national security threats or terrorists to justify the use of torture; (4) the Uzbek government targets families of individuals suspected of membership in banned Islamic groups; (5) between 2013 and 2015, the European Court of Human Rights issued at least 15 judgments prohibiting the forcible transfer of individuals to Uzbekistan due to the risk of torture. Similarly, a 2016 U.S. State Department human-rights report stated that Uzbekistan has a long-standing problem with state-sanctioned torture.

See *Madjitov v. U.S. Attorney General*, No. 19-13865, Order dated Nov. 25, 2019, Exhibit H, at 3-4 (Rosenbaum, dissenting).

Then, just this week, the Eleventh Circuit denied Mr. Madjitov's motion to reopen his removal proceedings on the basis of changed conditions implicating his asylum application. Critically, the Eleventh Circuit found that Mr. Madjitov had successfully showed through an extensive record that "'Uzbekistani authorities routinely target relatives of detainees or prisoners charged with or convicted of anti-state offences' and families of those suspected of membership in banned Islamic movements or groups, in order to pressure them to disclose the suspect's whereabouts or pressure them to surrender themselves." *Madjitov v. U.S. Attorney General*, No. 19-13865, Order dated Sep. 14, 2020, Exhibit G, at 10. In other words, Mr. Madjitov was unsuccessful in his motion to reopen not because he failed to show that the government of

Uzbekistan is likely to torture and persecute him on the basis of his relationship to his brother-in-law. Rather, the court denied Mr. Madjitov's motion because Uzbekistan's practice of such torture and detention has been so long-standing and persistent that the court did not consider Mr. Madjitov's record showing conditions of deployment of advanced surveillance techniques and recent cases of state-sanctioned retaliatory violence to meaningfully constitute changed country conditions such as would allow him to reopen his case beyond the statutory filing deadlines. *See id*. at 11.

Ultimately, as both the majority and the dissent in the Eleventh Circuit agreed, it is very likely that Mr. Madjitov will be detained persecuted, and tortured if he is removed to Uzbekistan.

## ARGUMENT

### I. This Court Is Authorized to Grant The Requested Temporary Restraining Order and Preliminary Injunction

The United States may argue that this Court lacks power to enter a temporary stay of Mr. Madjitov's removal, but any such contention would be incorrect, as this Court possesses several independent sources of authority to issue a temporary stay.

#### a. The Constitutional Access-to-Courts Doctrine Empowers the Court to Issue the Temporary Stay of Removal

The Constitution requires that litigants have "meaningful access to the courts." *Bounds v. Smith*, 430 U.S. 817, 824 (1977) . When government action thwarts a litigant's ability to vindicate "basic constitutional rights," *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974), or "fundamental civil rights," *Bounds*, 430 U.S. at 827, courts are empowered to issue appropriate relief. *See also Lewis v. Casey*, 518 U.S. 343, 349-50, 354-55 (1996) (noting that it is "well-established" that courts are to "provide relief to claimants . . . who . . . will imminently suffer . . . actual harm"). Because Defendants' imminent plan to remove Mr. Madjitov would deprive him

of his opportunity to pursue his claims, this Court is authorized to issue a temporary stay pursuant to the constitutional access-to-courts doctrine.

Meaningful access to the courts is squarely grounded in the guarantees of the Constitution, including the Fifth Amendment Due Process Clause and the First Amendment. In the first place, the "right of access to the courts is . . . [an] aspect of the [First Amendment] right to petition." *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002)  (internal citation omitted). Public access to the courts serves First Amendment interests by "allow[ing] the public airing of disputed facts." *BE & K Constr. Co*., 536 U.S. at 525. The right of meaningful access to the courts is also based in the Due Process Clauses of the Fifth and Fourteenth Amendments. *Procunier v. Martinez*, 416 U.S. 396, 419 (1974) (access to the courts is a corollary to "constitutional guarantee of due process of law"), overruled on other grounds; *Thornburgh v. Abbott*, 490 U.S. 401 (1989); *Johnson v. Avery*, 393 U.S. 483, 498 n.24 (1969) ("Reasonable access to the courts . . . is a right . . . secured by the Constitution . . . .") (citations omitted). Although courts have articulated various bases for the doctrine, it is indisputably a principle of constitutional significance and cannot be repealed by statute or implication. Indeed, the Supreme Court has recognized the right to petition as "one of the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967).

ICE's imminent removal of Mr. Madijitov would impermissibly defeat his ability to meaningfully pursue his constitutional claims for three reasons: *First*, upon arrival in Uzbekistan, Mr. Madjitov would most likely be arrested by the government and held in detention without access to communication with the outside world. *See* Declaration of Noah Tucker, Exhibit C. In detention, he would likely be tortured and possibly killed, rendering him unable to pursue his

case. *Id. Second*, even in the unlikely event that Plaintiff is not detained, he would be unavailable to testify in person at trial in support of his claims, and the telecommunications technology available in Uzbekistan is not sufficiently accessible or reliable to serve as an adequate substitute for live testimony. *See* U.S. State Department, *Uzbekistan 2016 Human Rights Report* (2017) ("The government intermittently restricted access to several internet messenger services, sometimes for several months, requiring a proxy server to access services such as Skype, Viber, and Telegram."). *Third*, during the course of the litigation, including the discovery phase, it would be virtually impossible for counsel to effectively represent Mr. Madjitov because he would not have access to sufficiently private, reliable, timely, and affordable methods of communication with his attorneys. In such circumstances, the Supreme Court has held that a court is empowered to issue relief to plaintiffs denied access to the courts, particularly where the Defendant United States has taken action that would frustrate Mr. Madjitov's attempt to litigate his claims. *See Christopher v. Harbury*, 536 U.S. 403, 413-14 (2002). In short, this Court should not permit Defendant United States, through its agency ICE, to prevent Mr. Madjitov from pursuing his meritorious claims by allowing ICE to remove him to a country and situation from which he would be entirely unable to litigate his claims effectively.

Furthermore, Mr. Madjitov satisfies the requirement of having carefully identified the claims for relief that give rise to his present access-to-courts plea. *See Christopher*, 536 U.S. at 417 (identification of underlying claims for relief is prerequisite for an access-to-courts claim). In his Complaint, Mr. Madjitov brings claims against Defendant United States of America for assault and battery, false imprisonment, intentional infliction of emotional distress, negligence, negligent supervision, and abuse of process, as well as claims against Defendants Goriah, Syed, and Aguilera for violations of the Fifth Amendment.

Finally, the remedy that Mr. Madjitov seeks is narrowly tailored to the imminent harm that would be occasioned by his removal at this time and is fully within this Court's power to issue. Cf. *Missouri v. Jenkins*, 515 U.S. 70, 88 (1995). The requested stay of removal would operate merely to suspend temporarily the order of removal. Unlike a permanent injunction, a temporary stay is not a "judicial intervention to . . . direct[] an actor's conduct." *Nken v. Holder*, 129 S. Ct. 1749, 1758 (2009) (internal citations omitted). "An alien seeking a stay of removal . . . does not ask for a coercive order against the Government, but rather for the temporary setting aside of the source of the Government's authority to remove." *Id*.

### b.   Article III Empowers This Court to Issue the Temporary Stay

Article III of the Constitution provides independent authority for this Court to issue the requested temporary stay. Federal district courts retain the "inherent power" to issue orders necessary to their jurisdiction over a pending case. *Chambers v. NASCO, Inc*., 501 U.S. 32, 43 (1991); *see id*. at 58 (Scalia, J., dissenting) ("Some elements of that inherent authority are so essential to the [Article III] judicial Power, that they are indefeasible, among which is a court's ability to enter orders protecting the integrity of its proceedings.").

This Court's inherent judicial power extends to the issuance of stays. *See, e.g., Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."); *Landis v. N. Am. Co*., 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court.").

### c.   The All Writs Act Provides a Separate Source of Authority for This Court to Issue the Temporary Stay

The All Writs Act, 28 U.S.C. § 1651, empowers courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The All Writs Act does not enlarge or expand the jurisdiction of the district court but

instead merely confers ancillary authority where jurisdiction is otherwise present and already lodged in the court. This ancillary authority allows courts to enter orders necessary to safeguard their jurisdiction, when that jurisdiction has another basis. *See, e.g., Penn. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 41 (1985) (describing Act as filling the interstices of federal judicial power when those gaps threaten to thwart the otherwise proper exercise of federal courts jurisdiction).

As the Supreme Court has recognized, "[t]he authority to issue a writ under the All Writs Act is not a font of jurisdiction," *United States v. Denedo*, 129 S. Ct. 2213, 2222 (2009), nor is it "a source of subject-matter jurisdiction," *id*. Instead, the "court's power to issue any form of relief, extraordinary or otherwise, is contingent on that court's subject-matter jurisdiction over the case or controversy." *Id*. at 2221. In this case, the Court has subject-matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (Bivens and FTCA claims) and 28 U.S.C. § 1346(b) (FTCA claims). As such, this Court has the authority under the All Writs Act to issue a temporary stay in connection with its subject-matter jurisdiction over the underlying claims.

### d.   The Immigration and Nationality Act Does Not Strip This Court of Its Power to Issue a Temporary Stay

The Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 et seq., does not bar this Court from granting a temporary stay of removal. More specifically, any contention that 8 U.S.C. § 1252(f) or (g) strips the Court of this power would be incorrect.

Subsection 8 U.S.C. § 1252(f) does not preclude the issuance of a temporary stay. Although (f)(1) bars all lower federal courts from enjoining or restraining the operation of certain INA provisions, subsection (f)(1) "specifies that this ban does not extend to individual cases." *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 481-82 (1999). Thus, subsection (f)(1) is not a barrier to Mr. Madjitov's request for an emergency order simply

because he is an "individual alien against whom proceedings . . . have been initiated." 8 U.S.C. § 1252(f)(1). Subsection (f)(2), which applies only to *permanent* prohibitions, does not bar the court from granting the *temporary* stay Mr. Madjitov seeks. See *Nken v. Holder*, 129 S. Ct. 1749, 1760 (2009) (finding that "subsection (f)(2) does not comfortably cover stays,", and that "applying the subsection (f)(2) standard in the stay context results in something that does not remotely look like a stay").

Likewise, subsection 8 U.S.C. § 1252(g) does not constrain this Court's jurisdiction over Plaintiff's request for a temporary stay. First, the Supreme Court has adopted a narrow construction of the terms of § 1252(g), holding that it "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to commence proceedings, adjudicate cases, or execute removal orders.". *See AADC*, 525 U.S. 471, 482, 485 n.9 (1999). In *AADC*, majority rejected the notion that "§ 1252(g) covers the universe of deportation claims—that it is a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review." Second, §1252(g) must be read together with § 1252(f), as interpreted by *Nken*. Section 1252(f)(2), as discussed, establishes the standard for issuance of permanent injunctions in individual removal cases, but does not apply to mere stays of removal. *See Nken*, 129 S. Ct. at 1760. Although the "notwithstanding any other provision of law" clause of § 1252(g) purports to bar all stays of removal except those authorized by § 1252(f), the Supreme Court's decision in *Nken*, providing for the issuance of *temporary* stays of removal, clearly indicates that such limited stays may be issued outside of the authority of § 1252(f) and notwithstanding the language of § 1252(g). Accordingly, the INA does not deprive this Court of its inherent jurisdiction over this temporary stay.

## II.     Plaintiff Is Entitled to Preliminary Injunctive Relief

To obtain preliminary relief in this Circuit, a movant must demonstrate "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction." *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). While a petitioner seeking a preliminary injunction has the burden of demonstrating likelihood of success on the merits, they are not required to prove their case in full at the preliminary injunction stage, but only such portions as enable them to obtain the injunctive relief that they seek. See *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Each of the relevant factors favors preliminary relief here.

### a.   *Plaintiff Is Likely to Succeed On The Merits*

Under the FTCA, Mr. Madjitov brings claims against Defendant United States of America for assault and battery, false imprisonment, intentional infliction of emotional distress, negligence, negligent supervision, and abuse of process. The Federal Tort Claims Act grants the federal district courts jurisdiction over a certain category of claims for which the United States has waived its sovereign immunity and "render[ed]" itself liable. *Richards v. United States*, 369 U.S. 1, 6 (1962). This category includes claims that are:

> "[1] against the United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

28 U.S.C. § 1346(b). In the present case, Mr. Madjitov is bringing a money damages claim against the United States government for personal injury caused by the wrongful and negligent acts of its employees, namely Defendants Aguilera, Syed, and Goriah, while they acted within the scope of their employment for the U.S. government.

Each of the claims pleaded by Mr. Madjitov in his Complaint are viable, meritorious, and supported by an extensive record. However, given the urgency resulting from Mr. Madjitov's imminent removal, this memorandum will narrow the focus of the merits discussion for this motion to a few selected claims. Mr. Madjitov reserves the right to submit an amended memorandum of points and authorities in support of this motion for a temporary restraining order and preliminary injunction.

### i.   Plaintiff is Likely to Prevail in His Assault Claim

The FTCA expressly waives sovereign immunity for intentional tort claims that are based on the conduct of "investigative or law enforcement officers." 28 U.S.C. § 2680(h). The FTCA defines investigative or law enforcement officers as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). Immigration agents are law enforcement officers under this definition. *Caban v. United States*, 728 F.2d 68, 70 (2d Cir. 1984) (holding that "INS agents are 'investigative or law enforcement officers' within the meaning of this section."). Accordingly, the FTCA allows Plaintiff to bring intentional tort claims against Defendants.

Because the alleged incident occurred in New York, the substantive tort law of New York applies to Plaintiff's claims. *See Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019) ("The source of substantive liability under the FTCA is the law of the State."). Under New York law, to sustain a cause of action to recover damages for assault, Plaintiff must prove (1)

31

physical conduct (2) placing the plaintiff in imminent apprehension of (3) harmful contact. *See Bastein v. Sotto*, 749 N.Y.S.2d 538, 539 (2002).

In the present case, in contravention of a court order staying Mr. Madjitov's removal from the United States, Defendants Aguilera, Syed, and Goriah engaged in violent and threatening physical conduct by pushing and pulling Plaintiff towards the plane. They simultaneously threatened to handcuff and drag him on board if he did not board voluntarily and threatened to strike him with an electric taser if he continued to refuse to board.

These actions placed Mr. Madjitov in imminent apprehension of harmful contact, as Defendants had the apparent ability to effectuate their threats because they had Mr. Madjitov physically restrained between the three of them, and Officer Goriah noticeably had a taser hanging from his belt.

Mr. Madjitov's apprehension was proven correct when Defendants effectuated their threat and harmed him by tasing and beating him. Defendants are very unlikely to be able to provide any standard form of justificatory defense typically available to agents in their position because this assault was perpetrated in the context of depriving Mr. Madjitov of his constitutional rights through an unlawful attempt to deport him.

Accordingly, Plaintiff is likely to succeed in showing that he can recover damages for assault under the FTCA.

### ii. Plaintiff is Likely to Prevail in His Battery Claim

Under New York Law, to recover damages for battery, Mr. Madjitov must prove that (1) there was bodily contact, (2) the contact was offensive, and (3) the defendant intended to make the contact, (4) without the plaintiff's consent." *Bastein v. Sotto*, 749 N.Y.S.2d 538, 539 (2002).

Defendant's employees made bodily contact with Plaintiff when they beat Mr. Madjitov; pushed him into a wall where his neck and head were twisted; and struck him with an electric taser twice.

Defendants' contact was offensive as it was "wrongful under all the circumstances." *Zgraggen v. Wilsey*, 200 A.D.2d 818, 819 (N.Y. App. Div. 1994) . First, Defendants made contact with Mr. Madjitov for the unlawful purpose of violating a court order. Second, even if they had been executing a lawful removal, Defendants' actions violated Department of Homeland Security policy, which provides that detainees "shall be escorted in a manner that is safe, secure, humane, and professional," <u>USCIS Update to the Detention and Deportation Officers Field Manual: Appendix 16-4, Part 2, Enforcement Standard Pertaining to the Escorting of Aliens</u>, and ICE Detention Standards, which explicitly prohibit striking a detainee for failing to obey an order. *See* <u>2018 DHS Policy Statement 044-05</u>, "Department Policy on the Use of Force, Section III.H.2; <u>ICE 2019 National Detention Standards for Non-Dedicated Facilities</u>, 2.8-I; and <u>ICE 2011 Performance-Based National Detention Standards (Revised 2016), 2.8-II.A.1</u>. Third, Defendants' conduct caused Mr. Madjitov unnecessary long-term physical and emotional harm.

Prior to making contact, Defendants explicitly threatened to handcuff and tase Mr. Madjitov if he did not board the plane willingly. Before and after those threats, Defendants intentionally made contact with Mr. Madjitov body in order to coerce him onto the plane. Mr. Madjitov did not consent to contact by the Defendants, as he repeatedly informed Defendants that he had a federal court order staying his removal and asserted his constitutional rights by refusing to board the plane. As Defendants beat and tased him, Mr. Madjitov screamed and pleaded for help.

Accordingly, Mr. Madjitov is likely to succeed in showing that he can recover damages for battery under the FTCA.

### iii.  Plaintiff is Likely to Prevail in His Negligence Claim

Under New York law, to prevail on a negligence claim, a plaintiff must establish: "(1) that a duty of care was owed by the defendant to the plaintiff; (2) that the defendant breached that duty; (3) that the defendant's breach was a proximate cause of the plaintiff's injuries; and (4) that plaintiff was damaged." *Crews v. Cty. of Nassau,* 612 F.Supp.2d 199, 205 (E.D.N.Y. 2009).

Defendants owed Mr. Madjitov a duty of care because he was detained in their custody. As officers of the United States government, Defendants had a duty to follow a restraining order issued by a federal court staying Plaintiff's removal from the United States. Absent this duty, federal court restraining orders would be rendered meaningless and the orderly operation of the judiciary gravely impaired. Defendants breached that duty both by attempting to remove Mr. Madjitov in contravention of a federal court order and by failing to confirm that he did in fact have a stay of removal after Mr. Madjitov repeatedly informed them of this fact.

The Defendants' breach of duty was a proximate cause of Mr. Madjitov's injuries because Mr. Madjitov would not have been beaten, pushed or tased and would not have suffered physical and emotional harm had the Defendants not attempted to unlawfully remove him from the United States. Mr. Madjitov did not cause a disturbance or resist any lawful orders by Defendants. In response to unlawful orders by Defendants, Mr. Madjitov simply and repeatedly articulated his constitutional right to remain in the country and remained standing upright, without swinging his arms or acting in any violent manner. Even if Mr. Madjitov had aggressively resisted Defendants' orders or caused a disturbance, those forms of resistance were reasonable and predictable and in no way justified the plainly excessive use of violent force by Defendants who acted unlawfully at all times while trying to deport Mr. Madjitov.

Mr. Madjitov was seriously damaged by the Defendants' negligence, experiencing both immediate and long-term harms as a result of Defendants' actions. At the airport, Mr. Madjitov was in pain and unable to walk, requiring emergency medical attention. In the days after the assault, Mr. Madjitov felt the pain of several hardening scabs in the area of his back where he suffered taser burns. Since then, Mr. Madjitov has experienced recurring back pain; bouts of spinal pain which radiate from his back to his right shoulder and chest and then to his neck and head; and numbness on the left side of his body. Mr. Madjitov did not have these forms of pain and injury prior to ICE's assault.

Accordingly, Mr. Madjitov will likely succeed in showing that he can recover damages for negligence under the FTCA.

### b.   Plaintiff Will Suffer Irreparable Harm Absent Relief

There is no doubt that irreparable injury would result from the denial of Mr. Madjitov's motion for relief through a temporary restraining order and preliminary injunction. ICE is preparing to imminently remove Mr. Madjitov to Uzbekistan. As the United States Court of Appeals for the Eleventh Circuit recently confirmed, Mr. Madjitov is likely to be physically persecuted and tortured if he is removed to that country. *See Madjitov v. U.S. Attorney General*, No. 19-13865, Order dated Nov. 25, 2019, Exhibit H, at 3-4 (Rosenbaum, dissenting); *see also Madjitov v. U.S. Attorney General*, No. 19-13865, Order dated Sep. 14, 2020, Exhibit G, at 10.[3] The record provides lengthy, clear, and strong evidence that if ICE removes Mr. Madjitov to Uzbekistan prior to litigation of his FTCA claim, it will lead to his likely torture by that

---

[3] The Court did not deny Mr. Madjitov's petition for relief because it felt he was unlikely to be tortured in his home country. To the contrary, the Court ruled against Mr. Madjitov only because it found that Uzbekistan's practices of regularly detaining, torturing, and persecuting individuals in Mr. Madjitov's position were so entrenched and have been so persistent that recent changes to techniques of surveillance and torture did not sufficiently constitute changed country conditions to provide a basis for reopening his prior removal proceedings.

government and Mr. Madjitov will almost certainly suffer irreparable injury in the present case because he will be unable to access this Court or communicate with counsel, severely hindering his ability to effectively pursue his right to seek monetary damages under the FTCA for the plainly unlawful and violent assault that government agents committed against Mr. Madjitov on June 10, 2019. *See* Declaration of Noah Tucker, Exhibit C.

> ### i. Plaintiff Will Be Unable to Pursue His FTCA Claim If Denied a TRO and Preliminary Injunctive Relief

Given that ICE seeks to imminently remove Mr. Madjitov to Uzbekistan and that he will very likely be detained, persecuted, and tortured in Uzbekistan, Mr. Madjitov is likely to suffer irreparable harm in the form of being denied his right to effectively pursue his FTCA claim absent relief from a TRO and preliminary injunction.

Absent injunctive relief, Mr. Madjitov's denial of his right to pursue his FTCA claim may take many forms, any of which would cause irreparable harm. First, if Mr. Madjitov is detained in Uzbekistan, as is likely upon removal, he will not be able to participate in his FTCA litigation because he will lack of effective access to counsel and other resources, such as a computer or phone, necessary to pursue litigation from a foreign jurisdiction. *See* United States Department of State, *Uzbekistan 2016 Human Rights Report* (2017), Exhibit K, at 8; Declaration of Noah Tucker, Exhibit C. Second, if Mr. Madjitov is tortured, as is likely upon removal, he will not only suffer physical and psychological harms that may render him unfit to pursue his FTCA claim effectively, but he may also die and have no opportunity to continue litigation. Third, even if Mr. Madjitov is neither detained nor tortured, he lacks sufficient financial and other resources to support himself in Uzbekistan, where expatriates and deportees are generally stigmatized. His marginalization will render it difficult for Mr. Madjitov to effectively litigate. In contrast, if Mr. Madjitov remains in ICE detention, he will continue to have the requisite baseline level of access

to counsel, freedom from torture, and medical treatment that he requires to effectively avail himself of his right to seek redress against ICE for their unlawful and violent assault against him.

Furthermore, it is also impossible to fully grasp the full extent of the irreparable harm facing Mr. Madjitov without considering his family's financial and familial hardships. He is the father of three young children. His wife, in a compelling affidavit, describes how Mr. Madjitov's absence—and especially his potential removal—has made raising their children immensely more difficult; has exacerbated financial hardships; and has had acutely damaging emotional effects on their children. *See* Declaration of Madina Mamadjonova., Exhibit B at ¶ 27-29. As Mr. Madjitov's wife detailed in her affidavit, she had to give birth to their third son while Mr. Madjitov was detained. *Id*. She describes the "unbearable" pain of going through 27 hours of difficult labor without her husband by her side. *See id*., at ¶ 23. Because she had two other small children to care for at home, she left the hospital just 24 hours after giving birth. *See id*., at ¶ 26. And soon after she was discharged from the hospital, she fell down a flight of stairs—resulting in another trip to the hospital. She attributes this, understandably, to the stress associated with the absence of her husband and the burden of raising three children alone. She has taken to seeking donations from family and friends in order to pay rent.

Failing to issue a TRO or preliminary injunctive relief staying Mr. Madjitov's removal during the pendency of his FTCA litigation—almost certainly guaranteeing an imminent deportation to Uzbekistan—would greatly exacerbate the harms that Mr. Madjitov's wife and children already face. In other words, the indefinite continuance of the physical and psychological tolls of financial, housing, and food insecurity are all irreparable harms that Mr. Madjitov and his beloved U.S. citizen spouse and three young children will endure if Mr. Madjitov is denied his right to seek monetary damages from his FTCA claim that is likely to be

successful on the merits. Indeed, such severe impacts on the innocent family members of a petitioner establish irreparable harm to the petitioner himself. *See Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc) (noting that "important factors" in the irreparable harm analysis "include separation from family members, medical needs, and potential economic hardship").

      **c.**    ***The Balance of Hardships and The Public Interest Support A Preliminary Injunction***

The balance of hardships and the public interest "merge when the government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Mr. Madjitov faces considerable irreparable injury if an injunction is not granted preventing his imminent removed to Uzbekistan. In contrast, neither the public nor the Government will suffer material hardship from an expeditious temporary restraining order and a subsequent preliminary injunction allowing Mr. Madjitov to remain in the country to pursue his pending legal actions.

It is not in the public interest to send Mr. Madjitov to face likely torture and death, especially while he is pursuing legal relief in the United States. As Eleventh Circuit Judge Rosenbaum noted in her dissent to that court's denial of a stay of removal, "it does not appear that Madjitov is dangerous or that the government has any special interest in his immediate removal." *Madjitov v. U.S. Attorney General*, No. 19-13865, Order dated Nov. 25, 2019, Exhibit G, at 8 (Rosenbaum, dissenting). Since Mr. Madjitov arrived in the United States in 2006 on a P-3 Visa for Artists or Entertainers, he has been a law-abiding and productive member of the community. He has been a loving and devoted husband and father to three young children, one of whom was born a week after Mr. Madjitov was initially arrested by ICE in December 2017. *See* Declaration of Madina Mamadjonova, Exhibit B. Mr. Madjitov has still never held his youngest child in his arms; that son is now approaching his third birthday. *Id*. Because Mr. Madjitov is not

(nor has he ever been) dangerous and the government has advanced no reason to accelerate Mr.

Madjitov's removal, the immediate removal of Mr. Madjitov would not serve a compelling

public interest. Conversely, it is in the public interest to ensure that all of those within the United

States can access our courts and have a chance to show that they are entitled to damages for

tortious and unconstitutional conduct committed against them. It simply cannot be in the public

interest to allow ICE to evade responsibility for such acts by removing noncitizens harmed by its

agents to a locale where they are likely to be detained, tortured, and rendered unable to litigate

their claims.

Mr. Madjitov has a vital interest in remaining close to counsel in order to fully access the

courts, and in not being returned to a hostile and potentially lethal environment in Uzbekistan.

Should he be returned to Uzbekistan, country conditions overwhelmingly establish a high

likelihood that he will be detained and tortured, making it impossible for him to mount a robust

legal case and pursue avenues of relief to which he is constitutionally entitled. *See* Declaration of

Noah Tucker, Exhibit C. Mr. Madjitov's removal would effectively prevent him from engaging

in any meaningful way with his counsel and with his own legal representation.

In evaluating the balance of hardships, the Court should also consider the harms that

would befall Mr. Madjitov's family if Mr. Madjitov is removed while his litigation is pending.

Aside from the additional anguish and anxiety that his wife and young children would suffer, his

family would shoulder the added burden of attempting to support Mr. Madjitov, who will need

ongoing medical care, and endeavoring to advance his legal matters, all from thousands of miles

away. Mr. Madjitov's lawsuit before this Court seeks damages to compensate him for the

physical and mental trauma he suffered at the hands of ICE. It has been established above that he

is likely to succeed on the merits of this case, thus relieving the financial burden on his family to

support him given his reduced earning capacity (whether in Uzbekistan, should he eventually be removed and survive there long enough to collect his damages, or in the United States, should his Second Circuit appeal be granted).

Any hardships that ICE or DHS would suffer upon the granting of the present motion would be minimal and would relate to the cost of housing Mr. Madjitov in detention. ICE and DHS can relieve themselves of this harm at any point of their own accord simply by releasing Mr. Madjitov from detention. He is not a flight risk, since he would simply return to his U.S. citizen spouse and three young children in Connecticut, and he has no negative equities apart from his refusal to be unlawfully removed to a country where he will likely be detained and tortured. As such, the significant and lasting harm to Mr. Madjitov that would result from his removal greatly outweighs any harm that the government would suffer from the preservation of the status quo—that is, from simply allowing Mr. Madjitov to remain where he is for the time being in order to fairly litigate the present action and seek a remedy for the grievous wrongs he has suffered at the hands of our government.

## **CONCLUSION**

Considering the foregoing, the Court should GRANT an expeditious temporary restraining order and a subsequent preliminary injunction staying Mr. Madjitov's removal.


Dated: September 18, 2020

Respectfully submitted,

/s/ *Ahmed Mohamed*
COUNCIL ON AMERICAN-ISLAMIC RELATIONS, NEW YORK INC.
Ahmed Mohamed, Esq.
46-01 20th Avenue, Queens, NY 11105
ahmedmohamed@cair.com

T: (646) 665-7599
F: (646) 934-6051

/s/ Diana R. Blank
NEW HAVEN LEGAL ASSISTANCE ASSOCIATION
Diana R. Blank, Staff Attorney*
Benjamin Haldeman, Immigrant Justice Corps Fellow*
Pirzada Ahmad, Clinical Law Student**
Raquel Begleiter, Clinical Law Student**
Hannah Carrese, Clinical Law Student**
Anthony Tohmé, Clinical Law Student**
Carolina Eguchi Yamamoto, Clinical Law Student**
205 Orange Street
New Haven, CT 06510
T: (203) 946-4811 (ext. 1121)
F: (203) 498-9271

*Pro Hac Vice Motion forthcoming
**Motion for law student appearance forthcoming

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing motion for Plaintiff

Bakhodir Madjitov was served via ECF on all parties. I further certify that electronic copies of

this motion and accompanying exhibits will be provided to Defendants Counsel James R. Cho,

Assistant U.S. Attorney, to the email address:


James R. Cho
Assistant U.S. Attorney
U.S. Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th floor
Brooklyn, New York 11201
718-254-6519 (direct)
718-254-7483 (fax)
james.cho@usdoj.gov


/s/ *Ahmed Mohamed*
COUNCIL ON AMERICAN-ISLAMIC RELATIONS, NEW YORK
INC.